IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

MALIKA DANIELS ACOFF,           :
                                :
        Plaintiff,              :
                                :
vs.                             :
                                :    CIVIL ACTION 15-0644-M
CAROLYN W. COLVIN,              :
Social Security Commissioner,   :
                                :
        Defendant.              :

MEMORANDUM OPINION AND ORDER

In this action under 42 U.S.C. § 1383(c)(3), Plaintiff
seeks judicial review of an adverse social security ruling
denying a claim for Supplemental Security Income (hereinafter
*SSI*) (Docs. 1, 11).  The parties filed written consent and this
action was referred to the undersigned Magistrate Judge to
conduct all proceedings and order judgment in accordance with 28
U.S.C. § 636(c), Fed.R.Civ.P. 73, and S.D.Ala. Gen.L.R. 73(b)
(*see* Doc. 11).  Oral argument was heard on August 9, 2016.
After considering the administrative record, the memoranda of
the parties, and oral argument, it is **ORDERED** that the decision
of the Commissioner be **REVERSED** and that this action be **REMANDED**
for further administrative proceedings not inconsistent with
this Order.

This Court is not free to reweigh the evidence or
substitute its judgment for that of the Secretary of Health and

Human Services, *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983), which must be supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence requires "that the decision under review be supported by evidence sufficient to justify a reasoning mind in accepting it; it is more than a scintilla, but less than a preponderance." *Brady v. Heckler*, 724 F.2d 914, 918 (11th Cir. 1984), *quoting Jones v. Schweiker*, 551 F.Supp. 205 (D. Md. 1982).

At the time of the most recent administrative determination, Acoff was twenty-eight years old, had completed an eighth-grade education (Tr. 549), and had no relevant previous work experience (Tr. 521). Plaintiff alleges disability due to intellectual disability, attention deficit disorder, cluster B personality disorder, depressive disorder, psychosis NOS, folliculitis decalvans, headache disorder, and peripheral vascular disease (Doc. 11 Fact Sheet).

The Plaintiff applied for SSI on October 25, 2005, asserting a disability onset date of October 1, 2005 (*see* Tr. 27; Tr. 221-23). An Administrative Law Judge (hereinafter *ALJ*) denied her benefits, determining that Acoff could perform specific light work jobs (Tr. 97-107). Plaintiff requested review of the hearing decision by the Appeals Council (*see* Tr. 27, 156-61).

While that review was pending, Acoff filed a new SSI

application (Tr. 241-44).  On May 8, 2009, the State agency
found Plaintiff disabled as of April 6, 2009 on her second
application (*see* Tr. 27).

On October 26, 2009, on review of the first SSI
application, the Appeals Council entered an order that combined
the two applications and remanded them to an ALJ to gather
additional evidence and reconcile the two decisions (Tr. 117-
18).  On March 24, 2011, the ALJ found that in spite of her
severe impairments, Acoff was not disabled and could work, with
some limitations; he named specific light and medium jobs that
she could perform (Tr. 599-624).  The Appeals Council denied
Plaintiff's request for review (Tr. 1-5).

Acoff filed a civil action in the United States District
Court for the Middle District of Alabama.  On March 6, 2014,
United States Magistrate Judge Wallace Capel, Jr. found that the
ALJ had failed to properly consider whether Plaintiff had met
the requirements of Listing 12.05; the action was remanded for
further proceedings and judgment was entered (Tr. 631-41).

On August 27, 2015, the ALJ, on remand, found that Acoff
had multiple severe impairments, but that she was not disabled
and could perform specific light- and medium-exertion level jobs
(Tr. 480-523).  He specifically found that she did not meet the
requirements of Listing 12.05 (Tr. 518).

Plaintiff brought this action, claiming that the opinion of

3

the ALJ is not supported by substantial evidence.  Specifically, Acoff alleges that:  (1) She meets the requirements of Listing 12.05; and (2) the ALJ did not properly explain how he chose the evidence upon which he relied (Doc. 11).  Defendant has responded to—and denies—these claims (Doc. 14).  The Court's summary of the relevant evidence of record follows.

On October 3, 2005, Acoff went to Cahaba Center for Mental Health, reporting depression and several childhood problems; the Therapist noted poor self-esteem and judgment (Tr. 340). (Tr. 338-43).  On October 24, Plaintiff reported being in special classes as a child and the reason she quit school; she was taking GED classes, but could not sit still or concentrate (Tr. 339).  She had been to a job fair (*id.*).  On November 7, Psychiatrist Winston Pineda examined Acoff and noted depressed affect, but no evidence of a thought disorder; memory and concentration were grossly intact (Tr. 341-42).  The Doctor estimated her intellectual functioning to be below average to borderline.  Pineda's assessment was to rule out depressive disorder NOS and rule out attention deficit disorder; he prescribed Ritalin.[1]

On February 8, 2006, at the request of the Social Security Administration (hereinafter *SSA*), Psychologist Nina E. Tocci

---

[1]**Error! Main Document Only.**"*Ritalin* is a mild central nervous system stimulant" used to treat Attention Deficit Disorders.  *Physician's Desk Reference* 1896-98 (52nd ed. 1998).

examined Acoff who was oriented in four spheres; she had fair
attention and poor concentration (Tr. 345-47).  Plaintiff had a
poor fund of information and comprehension; she had scattered
thought organization though content was appropriate to mood and
circumstances.  Acoff reported difficulty sleeping and daily
crying; she had poor insight and only fair social judgment.
Tocci found her functioning within the mentally retarded range
of intellectual ability.  The Psychologist administered the
Wechsler Adult Intelligence Scale-Third Edition (hereinafter
*WAIS-III*) on which Plaintiff achieved a verbal scale IQ of 61, a
performance scale IQ of 55, and a Full Scale IQ of 54,
classified to be in the mentally retarded range.  Though Acoff
was distracted and impatient during the test, Tocci said her
effort was fair and she considered the test results to be valid;
she indicated, however, that her scores could be depressed by
her emotional status.  The Psychologist diagnosed Plaintiff to
have depressive disorder NOS and mental retardation and
suggested she had a GAF of 65;[2] she thought Acoff's prognosis was
poor.

On February 28, at the request of SSA, Psychologist Eugene
E. Fleece reviewed the record as of that time and, without

---

[2]A GAF score between 61 and 70 indicates "[s]ome symptoms OR some
difficulty in social, occupational, or school functioning, but
generally functioning pretty well, has some meaningful interpersonal
relationships."  *See*
https://depts.washington.edu/washinst/Resources/CGAS/GAF%20Index.htm

benefit of examining Acoff, expressed the opinion that the IQ
tests were unreliable and that Plaintiff might be malingering
(Tr. 348).  Fleece went on to complete a Psychiatric Review
Technique Form indicating that Acoff could suffer from a
depressive disorder, NOS, but that mental retardation could be
ruled out; the Psychologist found her to have moderate
limitations in her daily living activities, maintaining social
functioning, and in maintaining concentration, persistence, or
pace (Tr. 349-62).  Fleece also completed a Mental Residual
Functional Capacity (hereinafter *RFC*) Assessment in which he
indicated that Plaintiff had a number of moderate limitations
but that she was markedly limited in her ability to understand,
remember, and carry out detailed instructions (Tr. 363-66).

On March 1, 2006, Doctor Peter A. Szmurlo at Cahaba Center
noted that Acoff was not on any medication, but that she could
not afford it; the Ritalin did not help when she was taking it
(Tr. 385).  Cymbalta was prescribed.[3]  On April 27, Plaintiff
reported taking her medicines and doing ok, though she was angry
all the time; the diagnosis was major depression (Tr. 384).  On
January 25, 2007, Acoff reported being off of her medications
for two months (Tr. 383).  On January 29, Plaintiff returned and
complained of depression and anxiety and reported medication

_____

[3]Cymbalta is used in the treatment of major depressive disorder.
**Error! Main Document Only.***Physician's Desk Reference* 1791-93 (62nd ed.
2008).

non-compliance (Tr. 391).  On February 14, Psychiatrist Timothy Baltz examined Acoff who reported being out of medications for a couple of weeks; she was depressed (Tr. 382).

On March 19, Acoff reported to the Cahaba Center that she was doing much better since restarting her medications (Tr. 389).  On May 14, she reported being depressed, irritable all the time, and angry; Plaintiff reported being calmer when she took her medication (Tr. 381, 388).  On September 11, Plaintiff brought back depression medications and asked to be put back on her Cymbalta (Tr. 380).  On October 30, Plaintiff returned to Cahaba Center, articulating depression, anxiety, and irritability (Tr. 403).  On November 8, Dr. Baltz examined Acoff who reported being depressed and suicidal as well as violent with her husband; Baltz diagnosed her to have dysthymic disorder, indicated a possible cluster B personality disorder, and prescribed an antipsychotic, Cymbalta, and a sedative (Tr. 399).  On February 18, 2008, the Psychiatrist reported Plaintiff's mood swings, insomnia, and thoughts of hurting herself or others; he changed her antipsychotic medication to Geodon[4] and prescribed Ambien[5] (Tr. 429).  On that same day, February 18, 2008, Psychiatrist Baltz completed a form

---

[4]*Geodon* is used in the treatment of schizophrenia.  **Error! Main Document Only.***Physician's Desk Reference* 2507-09 (62nd ed. 2008).

[5]*Ambien***Error! Main Document Only.** is a class four narcotic used for the short-term treatment of insomnia.  *Physician's Desk Reference* 2799 (62nd ed. 2008).

indicating that Acoff had a number of moderate limitations, but that she was markedly limited in her ability to do the following:  get along with co-workers or peers; understand, remember, and carry out complex instructions; maintain regular attendance and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; respond appropriately to supervision; and respond appropriately to changes in the work setting (Tr. 374-76).  It was Baltz's opinion that these limitations had existed for more than a year.  On April 14, Acoff reported sleeping better but was still stressed, angry, and emotional (Tr. 428).  Eight days later, Plaintiff complained that her medicine was making her sick; Prolixin[6] and Xanax[7] were prescribed (Tr. 427).  On July 14, Acoff reported that she had been off of her medications for a month, but had started taking them again and was doing better (Tr. 426).  On October 13, she had quit taking Cymbalta and Xanax; Dr. Baltz prescribed Trazodone[8] (Tr. 425).  He added

---

[6]**Error! Main Document Only.***Prolixin* "is an antipsychotic medication used to treat schizophrenia and psychotic symptoms such as hallucinations, delusions, and hostility." *See* http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682172.html

[7]**Error! Main Document Only.***Xanax* is a class four narcotic used for the management of anxiety disorders. *Physician's Desk Reference* 2294 (52nd ed. 1998).

[8]**Error! Main Document Only.***Trazodone* is used for the treatment of

"psychotic disorder NOS, maybe schizophrenic prodrome" to her diagnosis.  On April 2, 2009, Psychiatrist Baltz noted that Acoff indicated increased depression (Tr. 423).

On May 1, John R. Goff, Neuropsychologist, after reviewing certain—but not all—records provided to him by Plaintiff's Attorney, completed a report detailing fallacies in the evaluation of Acoff's mental impairments by various sources (Tr. 408-12).  Goff's report indicated that Acoff could be mentally retarded, but that a full and proper evaluation had not been completed.

On May 7, Psychologist Fleece, again without benefit of examination, completed a Psychiatric Review Technique form based on the evidence of record in which he indicated that Acoff suffered from psychosis NOS, dysthymic disorder, and a cluster B personality disorder (Tr. 451-64).  He indicated Plaintiff had marked difficulties in maintaining concentration, persistence, or pace and moderate limitations in daily living activities and in maintaining social functioning.  Fleece also completed a Mental RFC indicating that Acoff had some moderate limitations, but that she was markedly limited in the following:  her ability to perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; the ability to complete a normal workday and workweek without

depression.  *Physician's Desk Reference* 518 (52nd ed. 1998).

interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and the ability to interact appropriately with the general public (Tr. 465-68).  Fleece further indicated that she would miss three or more days a month because of her psychological disorder and that her contact with the general public should be infrequent.

Though Acoff had seen a Therapist at Cahaba regularly in the intervening period, she saw Dr. Baltz again on September 3, 2009 and reported increased energy, a more stable mood, and that she was sleeping better (Tr. 417-22).  Acoff saw a Therapist three times over the next four months, through January 14, 2010, and reported that she was feeling better about herself and her circumstances; she indicated that she wanted to return to work (Tr. 414-16).  On February 17, 2010, Psychiatrist Baltz examined Acoff who reported that she was doing well so long as she took her medicine; he made no changes in her treatment and scheduled the next appointment for five months later (Tr. 448).

On March 31, Psychologist Richard S. Reynolds examined Plaintiff who reported attending special education classes through the eighth grade and quitting due to pregnancy (Tr. 432-34).  Acoff was oriented in four spheres; her thoughts were logical and associations were tight.  She stated that she had been hearing voices for a while.  Remote memory was intact;

10

judgment, insight, and decision-making abilities appeared
impaired by psychosis.  The Plaintiff took the Minnesota
Multiphasic Personality Inventory-2 (hereinafter *MMPI*); Reynolds
opined that Acoff's "ability to understand, carryout, to
remember instructions, and to respond appropriately to
supervision, co-workers, [and] work pressures in a work setting
appear[ed] impaired by Psychosis, NOS" (Tr. 434).  The
Psychologist completed a mental medical source statement in
which he found Plaintiff moderately limited in doing most
everything, but markedly limited in the ability to make
judgments on complex work-related decisions (Tr. 436-38).

On April 1, 2010, Plaintiff reported frustration with some
family issues; her mental status was considered stable (Tr.
446).  She continued to receive regular Prolixin injections (Tr.
444-45).  On May 3, Dr. Baltz completed a mental source form in
which he indicated that Acoff would have marked limitations in
her ability to do the following:  interact appropriately with
the general public; get along with co-workers or peers;
understand, remember, and carry out complex instructions and
repetitive tasks; maintain attention and concentration for
extended periods; perform activities within a schedule, maintain
regular attendance and be punctual within customary tolerances;
sustain a routine without special supervision; complete a normal
workday and workweek without interruptions from psychologically-

based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; respond appropriately to supervision and changes in the work setting; and respond to customary work pressures (Tr. 440-42). The Psychiatrist indicated that Plaintiff had suffered these limitations for more than a year.

On May 25, 2010, W. Lee Stutts, Psychologist, administered the WAIS-III on which Acoff scored a verbal IQ of 64, a performance IQ of 63, and a full scale IQ of 61, scores in the mild range of mental retardation (Tr. 450). Stutts indicated that the results appeared to be valid as Plaintiff had put forth good effort.

On September 6, Doug McKeown, Ph.D., at the request of the SSA, reviewed the medical records available and, without benefit of examining her, completed a set of interrogatories concerning Acoff's mental impairments (Tr. 470-76). McKeown summarized the medical evidence and questioned the conclusions of Dr. Baltz and Neuropsychologist Goff. He found that the evidence did not support a mental retardation diagnosis either before or after the age of twenty-two; furthermore, Plaintiff had not satisfied the requirements for any mental disability. McKeown suggested that Acoff had mild restriction of daily living activities, moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence,

and pace.  The Psychologist indicated that Plaintiff was capable of performing simple tasks, but should have only limited contact with the general public; she had some moderate limitations, but was markedly limited in her ability to function independently.

On September 23, 2010, Dr. Baltz reported a normal exam; treatment remained the same (Tr. 798).  On February 21, 2011, the Psychiatrist noted that Acoff was exercising and had lost some weight; she was a little depressed (Tr. 797).  On June 23, Plaintiff stated that she had stopped her weight loss program, that she was alright, but that she had had thoughts of running away (Tr. 796).  Dr. Baltz's treatment continued as before with the following diagnosis:  Psychotic Disorder NOS, low grade; early onset dysthymic disorder; cluster B personality features; and family history of major mental illness.

On February 8, 2013, Acoff was seen at Baptist Medical Center East for tooth pain and migraines; she was treated with Phenergan[9] and Morphine and was prescribed Ultram[10] and Norco[11] (Tr. 837-56).

On December 4, 2013, following complaints of a headache, a

---

[9]**Error! Main Document Only.***Phenergan* is used as a sedative, sleep aid, or to treat nausea, vomiting, or pain. http://www.drugs.com/phenergan.html

[10]**Error! Main Document Only.***Ultram* is an analgesic "indicated for the management of moderate to moderately severe pain."  *Physician's Desk Reference* 2218 (54th ed. 2000).

[11]*Norco* is an opioid pain medication used to relieve moderate to severe pain.  *See* http://www.drugs.com/norco.html

CT of the head/brain was taken that revealed no acute intracranial injury (Tr. 830-32). Another CT two days later was normal (Tr. 828-29).

On January 3, 2014, Acoff complained of neck pain radiating into her upper back; x-rays of the cervical spine showed slight reversal of the alignment curve, perhaps secondary to muscle spasm (Tr. 817, 825-27). The spine was otherwise normal.

An ultrasound examination on February 5 revealed significant peripheral vascular disease; further evaluation was recommended (Tr. 833-35).

On September 29, Acoff went to UAB Health Systems and was treated for keloids on her scalp (Tr. 789-94).

This concludes the Court's summary of the evidence.

In bringing this action, Plaintiff has raised two different claims. In the first, she argues that she meets the requirements of Listing 12.05. Acoff does not specifically argue which subsection of the Listing she meets though, so the Court will set out the full Listing:

> Intellectual disability refers to a significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the development period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

> A.  Mental incapacity evidenced by
> dependence upon others for personal needs
> (*e.g.* toileting, eating, dressing, or
> bathing) and inability to follow directions,
> such that the use of standardized measures
> of intellectual functioning is precluded;
> OR
> B.  A valid verbal, performance, or
> full scale IQ of 59 or less;
> OR
> C.  A valid verbal, performance, or
> full scale IQ of 60 through 70 and a
> physical or other mental impairment imposing
> an additional and significant work-related
> limitation of function;
> OR
> D.  A valid verbal, performance, or
> full scale IQ of 60 through 70, resulting in
> at least two of the following:
>   1.  Marked restriction of activities of
>   daily living; or
>   2.  Marked difficulties in maintaining
>   social functioning; or
>   3.  Marked difficulties in maintaining
>   concentration, persistence, or pace; or
>   4.  Repeated episodes of
>   decompensation, each of extended duration.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.05 (2016).

In addressing Acoff's claim of disability from intellectual disability, the ALJ summarized the record evidence from Examiners and Non-Examiners alike; the summary included Plaintiff's testimony from three evidentiary hearings and two lengthy passages from Psychologist Doug McKeown's testimony, given as a Medical Expert (herein *ME*) at two of those hearings. The ALJ then reviewed the United States Supreme Court's decision holding that executions of mentally retarded individuals were

cruel and unusual punishment. *Atkins v. Virginia*, 536 U.S. 304 (2002). The ALJ quoted the definitions of mental retardation as defined by the American Association of Mental Retardation and the American Psychiatric Association (Tr. 491). The ALJ then, without discussing Listing 12.05, stated as follows:

> Thus, in order to establish that Claimant has intellectual disability, it must first be determined whether Claimant has significantly subaverage intellectual functioning. Second, it must be determined whether the significantly subaverage intellectual functioning is accompanied by **significant limitations in adaptive functioning** in at least two of the skill areas.

(Tr. 492) (emphasis added). The ALJ reviewed Acoff's IQ test scores and found them invalid. He noted that Psychologist Tocci thought the results of the test she administered were valid, though she noted Acoff was distracted, impatient, and depressed while taking it, exerting only fair effort so the scores could be depressed (Tr. 492). The ALJ accepted the ME's pronouncement that Tocci's test scores were invalid as inconsistent with her report and because Plaintiff had a driver's license and managed her own children (Tr. 492). The ALJ then rejected Tocci's test results because an expert who helped design the MMPI, taken by Acoff six years later by a different Examiner, had stated that a particular score on a scale in that test indicated that the

test-taker was "faking bad;" the ALJ found that this score on the MMPI strongly suggested that Plaintiff was malingering on Tocci's test as well (Tr. 492).[12]  The ALJ further noted that Non-Examiner Goff had suggested the possibility that Acoff had not put forth her best effort on Tocci's test because she was depressed (Tr. 493).  The ALJ returned to the ME's dismissal of the test results, this time because of Plaintiff's limited effort, her adaptive skills, and the fact that she completed the MMPI, the test she allegedly "faked bad" on, because the MMPI required reading and comprehension of the fifth grade level; the ALJ did not, however, acknowledge the ME's full statement:  "It must be noted that personality measure is considered valid and does require a reading and comprehension level of at least a fifth grade level **which would be consistent with mild mental retardation**"[13] (Tr. 476; *cf.* Tr. 493) (emphasis added).

As to the second test, the ALJ noted that Stutts, the Examiner, found the results valid.  The ALJ then noted that the Psychologist had not conducted a clinical interview and did not appear to know that Plaintiff may have malingered on a different test administered by a different examiner on a different date

---

[12]The Court notes the ALJ's reliance on this assertion six different times in the decision (Tr. 488, 492, 494, 508, 512, 519).

[13]The ALJ later noted the ME's testimony that Acoff's ability to complete the MMPI indicated she was functioning above retardation  (Tr. 676).  Nevertheless, the Court notes the ME's inconsistency in this regard.

(Tr. 492).

The ALJ concluded his discussion of the test validity by finding, in spite of the conflicting opinions, "neither set of IQ scores is valid, whether due to attention deficit hyperactivity disorder, depression, psychosis, malingering, or a combination thereof" (Tr. 493).

Following this finding, the ALJ returned to *Atkins* and reiterated the "**requirements used by the professional community** to establish intellectual disability:"

> The individual in question must have significant subaverage intellectual functioning that is **accompanied by significant limitations in adaptive functioning** in at least two of the following skill areas:  communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety.

(Tr. 494) (emphasis added).  The ALJ then reviewed Plaintiff's school records, noting that there was no evidence that she had received any special education services, been retained at any grade level, and that she had made relatively good grades (Tr. 494).  The ALJ reviewed conflicts in Acoff's testimony and in things she told her various Examiners and found her not credible, discounting her statements (Tr. 494-97).[14]  The ALJ

---

[14]The Court notes that Acoff has not challenged this finding.

then found that "[w]hile Claimant does have some deficits in adaptive functioning, the evidence does not demonstrate that those caused by her intellectual functioning are **significant, as required by the professional community**" (Tr. 496) (emphasis in original).

The ALJ then went on to review the balance of the medical evidence and explain what weight he gave it.  Examiner Reynolds's opinion of Acoff's abilities and limitations was given substantial weight though his finding that psychosis was the reason for these limitations was given little weight (Tr. 508).  Examining and treating Psychiatrist Baltz's assessment was rejected as "grossly and conspicuously inconsistent with his own previous and subsequent treatment notes" Tr. 509).  Baltz's diagnosis of dysthymic disorder was given controlling weight over the diagnoses of Examiner Szmurlo's diagnosis of major depressive disorder and Examining Psychologists Tocci's and Reynolds's diagnosis of major depressive disorder (Tr. 512).  Only partial weight was given to the ME's testimony and responses to the interrogatories (Tr. 513).  Great weight was given to the opinions of Fleece and the ME, both Non-Examiners,[15] that Acoff's impairments did not meet Listing requirements (Tr. 516).  Little weight was given to the opinions of Examiners Tocci and Stutts and Non-Examiner Goff that Plaintiff had

---

[15] McKeown never personally examined Acoff (*see* Tr. 678).

intellectual disability (Tr. 520).  The ALJ accepted the testimony of the Vocational Expert that there were specific medium-exertion jobs that Acoff could perform (Tr. 522).

In reviewing the ALJ's opinion, the Court notes that the ALJ never properly set out the requirements for Listing 12.05 in spite of the fact that the court opinion, remanding this action previously, specifically directed the analysis of this record under that Listing (Tr. 631-41).  The ALJ discussed *Atkins*, but the Court fails to see how it shed any light on the requirements of Listing 12.05.  Though that discussion provided the ALJ the opportunity to discuss the professional community's current thoughts in evaluating intellectual disability, the focus here is whether or not Acoff met Listing 12.05 or any other Listing. The discussion of the professional community's thoughts enabled the ALJ to ignore the specific introductory language in Listing 12.05C that reads as follows:  "Intellectual disability refers to a significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the development period."  This language does not require significant deficits in adaptive functioning—only deficits.  The ALJ, however, repeatedly misstates this requirement.

The Court finds that the ALJ's decision is not supported by substantial evidence.  The Court finds the following problems with the ALJ's decision:  The ALJ declared test results from one

IQ test invalid, though considered valid by the administrator,
because a scale on a different type of test given by a different
Examiner indicated that Plaintiff may be faking and that this
"strongly suggested" that she was faking on the test she had
taken six years earlier; the ALJ declared the IQ test results,
in the test administered by Stutts, to be invalid because the
Psychologist did not perform a clinical interview and did not
know that Plaintiff might have faked her answers on a different
test at a different time; and the ALJ did not acknowledge that
the ME had admitted that being able to complete the MMPI
required the abilities of a fifth-grader and that someone
functioning at a fifth-grade level would be consistent with a
person suffering from mild mental retardation.

However, the main reason the Court finds that the ALJ's
decision is not supported by substantial evidence is because the
ALJ misstated the requirements for Listing 12.05 as requiring
significant deficits in adaptive functioning.  This is an error
of law.  The Court further notes that the ALJ compounded this
error in finding that Acoff's failure to demonstrate the
requisite adaptive deficits was one of the reasons he found the
test results were invalid (Tr. 493).  "Failure to apply the
correct legal standards or to provide the reviewing court with
the sufficient basis to determine that the correct legal

principles have been followed is grounds for reversal.[16]"

*Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982).

Based on review of the entire record, the Court finds that the ALJ has not applied the correct legal standard in setting out the requirements for disability under Listing 12.05.  As such, the ALJ's decision cannot be said to be supported by the substantial evidence of record.  Therefore, it is **ORDERED** that the action be **REVERSED** and **REMANDED** to the Social Security Administration for further administrative proceedings consistent with this opinion, to include, at a minimum, a supplemental hearing for the gathering and consideration of evidence, including a new consultative psychological evaluation with intelligence testing, regarding Plaintiff's psychological impairments.  The Court further **DIRECTS** the Social Security Administration to assign this action to a new ALJ.  Judgment will be entered by separate Order.

DONE this 9th day of August, 2016.


s/BERT W. MILLING, JR.
UNITED STATES MAGISTRATE JUDGE

---

[16]"Where an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ" (footnote in original).